COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| ALAMO HEIGHTS INDEPENDENT SCHOOL DISTRICT, and RYAN ANDERSON, DAVID HORNBERGER, BRIAN HAMILTON, BONNIE GIDDEN, LISA KRENGER, PERRY SHANKLE, STACY SHARP, and DR. DANA BASHARA, in their Official Capacities, | § § § § § | No. 08-23-00124-CV<br><br>Appeal from<br><br>438th Judicial District Court |
| Appellants, | § | of Bexar County, Texas |
| v. | § | (TC# 2020CI23809) |
| SELINA JONES, ROY HUMMEL, and LESLIE MICHELLE PRUITT, | § § | |
| Appellees. | § | |

## **O P I N I O N**[1]

The lawsuit below was brought by Selina Jones, Roy Hummel, and Leslie Michelle Pruitt, tenants of an apartment complex (the Residents), who were displaced when it was purchased by the Alamo Heights Independent School District (the District). The District required the Residents to vacate their apartments in anticipation of its demolition. The Residents filed suit in Bexar County seeking relocation expenses, relocation assistance, and injunctive relief (all premised on two provisions in Chapter 21 of the Texas Property Code) against the District and several of its

---

[1] This opinion was originally issued on August 21, 2024. It is being re-issued to accompany the Corrected Judgment which is also being issued today.

officials (Ryan Anderson, David Hornberger, Brian Hamilton, Bonnie Gidden, Lisa Krenger, Perry Shankle, Stacy Sharp, and Dr. Dana Bashara) (collectively, AHISD).[2]

Before this Court, AHISD seeks interlocutory review of the trial court's order denying their second-filed motion for summary judgment, which expressly raised a jurisdictional plea as to claims brought under Chapter 21. We conclude that the claims asserted do not fall within any waiver of AHISD's governmental immunity, which therefore deprives the trial court of jurisdiction to reach the merits of the suit. But before explaining our reasoning for that holding, we tackle a challenge to our own jurisdiction based on the denial of AHISD's *first-filed* motion for summary judgment (which was not appealed). The Residents urge that if the first filed motion raised the same jurisdictional challenge, and was not appealed, the appeal of the second filed motion would be untimely.

We conclude that the first motion did not expressly raise a jurisdictional challenge—the second motion did—and we thus have jurisdiction to hear this appeal. We conclude that the second motion should have been granted, which deprives the trial court of jurisdiction over the merits of the suit.

## I. BACKGROUND

### A. AHISD buys an apartment complex and evicts its tenants

The Residents lived at the Desert Sands Apartments in San Antonio (the Property), where they paid monthly rent between $515 and $595. By 2020, each Resident was leasing month-to-month.

---

[2] This case was transferred pursuant to the Texas Supreme Court's docket equalization efforts. Tex. Gov't Code Ann. § 73.001. We follow the precedent of the Fourth Court of Appeals to the extent it might conflict with our own. *See* Tex. R. App. P. 41.3.

In March 2020, the District purchased the Property, which sits across the street from a local high school. To avoid revealing the District's identity as the buyer, it engaged another entity to enter into a contract to purchase the Property and subsequently assign its interests in the contract to the District. The District maintains that it took this approach to "negotiate a fair market price for the Property without fear that the seller would realize it was negotiating with a governmental entity and try to drive up the sales price[.]" After acquiring the Property, the District sent letters to the Residents still residing at Desert Sands, stating that it would extend their leases until June 30, 2020 to provide "enough time to find an alternate living accommodation," so long as the they "compl[ied] with all of the other terms and conditions of the Lease."

Each of the Residents faced challenges with the change in ownership. Mr. Hummel reported that soon after he received the District's letter, construction workers entered his home without knocking, claiming that they were part of a demolition team and had been told no one was living there. The District later agreed to extend Mr. Hummel's deadline to vacate until September 30, 2020. In August 2020, through counsel, Mr. Hummel sent the District a demand for relocation assistance under Texas Property Code § 21.046, which the District denied. Mr. Hummel ultimately found a new apartment in October 2020, but his rent increased from what he paid at Desert Sands.

Ms. Pruitt noticed maintenance issues after the District purchased the Property, including lapsed pest control and an unaddressed water leak that she says caused her electric bill to rise several hundred dollars more than normal. When she moved to a new apartment in July 2020, her rent increased more than $300 per month. She also reported that the District towed her car from Desert Sands, and she has been unable to retrieve it from storage due to her financial struggles.

At Ms. Jones's request, the District extended her deadline to vacate until September 30, 2020, though it denied her request for relocation assistance under § 21.046 of the Property Code. Ms. Jones retained counsel and again made a relocation-assistance demand. When Ms. Jones did not pay rent for August, the District sent her a notice of default, requesting that she become current on rent within 15 days or meet with District representatives to determine another payment arrangement. Ms. Jones instead renewed her demand for relocation assistance, which the District again denied. It instead offered to connect Ms. Jones with the owner of another apartment complex who was willing to assist her in renting an apartment at a reduced rate for a six-month lease. Those attempts failed, and the District gave Jones a notice to vacate on October 1 and again on November 5. The District began eviction proceedings but later dismissed its case after Ms. Jones vacated the Property on January 23, 2021.

**B. The Residents strike back, suing for relocation expenses**

In December 2020, the Residents sued the District as well as its superintendent and trustees in their official capacities. Their suit is premised on duties defined by § 21.046(b) of the Texas Property Code which provides that governmental entities "shall, as a cost of acquiring real property, pay moving expenses and rental supplements, make relocation payments, provide financial assistance to acquire replacement housing, and compensate for expenses incidental to the transfer of the property if an individual, . . . is displaced in connection with the acquisition." Tex. Prop. Code Ann § 21.046(b). The suit asserted an *ultra vires* claim against several officials of the District claiming they failed (1) to provide "any relocation advisory services or relocation program" or (2) "adopt[ ] rules relating to the administration of the relocation program" or (3)

4

provide several notices the Residents contend as required by § 21.046(b). As a separate claim, the Residents sought recovery of relocation expenses under § 21.043 of the Property Code.[3]

AHISD answered and aside from its general denial, pleaded six affirmative defenses, two of which claimed: (1) that because AHISD was immune from Appellees' claims, the trial court lacked subject matter jurisdiction; and (2) that Chapter 21 of the Texas Property Code was inapplicable to the subject of the suit because it only applied to eminent domain proceedings.

### C.   AHISD files for summary judgment on the merits

In March 2021, AHISD filed its first motion for summary judgment, which argued that AHISD had "no duty to pay any relocation fees" to the Residents because "[t]he eminent domain chapter of the Texas Property Code (Chapter 21), and the relocation program section therein (Section 21.046) are inapplicable to an arm's length purchase, such as the one at issue here." They also contended that the Residents "are not 'persons displaced due to an acquisition' as required for applicability of Section 21.046." The motion sought dismissal of the claims with prejudice. After a hearing, the trial court in June 2021denied the motion.

### D.   AHISD reloads its summary judgment motion, and adds a governmental immunity claim; the Residents file their own partial motion for summary judgment

In July 2022—over a year after the denial of its first motion for summary judgment—AHISD filed a second motion for summary judgment. In that motion, AHISD made the same arguments noted above but added that because "AHISD did not exercise its eminent domain

---

[3] That section allows that:

> A property owner who is permanently physically displaced from the property owner's dwelling or place of business and who is not entitled to reimbursement for moving expenses under another law may recover, in addition to the property owner's other damages, the reasonable expenses of moving the property owner's personal property from the dwelling or place of business.

Tex. Prop. Code Ann. § 21.043(a). The suit also sought injunctive relief to forestall Ms. Jones's then-pending eviction suit, but that claim is now moot.

authority, Chapter 21 itself deprives the Court of jurisdiction to decide any issues of amounts awardable under Chapter 21 Subchapter C[.]" It added that all discovery was complete, so the motion for summary judgment was ripe.

The Residents opposed the motion and filed their own motion for partial summary judgment, which asked the trial court to conclude that AHISD violated § 21.046.

### E. The trial court denies AHISD's motion and grants the Residents' motion

After hearing the cross-motions, the trial court denied AHISD's motion and granted the Resident's motion. Its order concluded that:

- AHISD has "ministerial duties under Texas Property Code section 21.046 and those duties apply to negotiated purchases of real property as well as demolition programs, even in the absence of any exercise of eminent domain authority";

- the Residents "are entitled to advisory services and relocation assistance as described in section 21.046 which requires [AHISD] to compensate [the Residents]";

- AHISD "acted *ultra vires* and violated their ministerial duties to [the Residents] under Texas Property Code section 21.046 by failing to provide relocation advisory services, to pay moving expenses, to pay rental supplements, to make relocation payments, to provide financial assistance to acquire replacement housing, and to compensate for expenses incidental to the transfer of property"; and

- AHISD "acted *ultra vires* and violated their ministerial duty by failing to adopt rules relating to the administration of a relocation assistance program under Texas Property Code section 21.046."

AHISD filed its notice of accelerated interlocutory appeal. After filing their merits brief, the Residents moved to dismiss the appeal for lack of appellate jurisdiction due to AHISD's purported untimely notice of appeal.

## II. THE MOTION TO DISMISS

The Residents ask that we dismiss this appeal because AHISD's second motion for summary judgment re-urged the same grounds for dismissal as in their first motion, making the second motion effectively a motion to reconsider, which is not subject to interlocutory appeal.

Thus, the Residents argue that AHISD's appeal deadline lapsed 20 days after the trial court's denial of its first motion for summary judgment—nearly two years before AHISD filed its notice of appeal.

AHISD urges otherwise, contending its first motion did not seek dismissal on jurisdictional grounds but sought dismissal based on the Residents' failure to state a cognizable claim. AHISD maintains it raised governmental immunity and the lack of subject-matter jurisdiction under Chapter 21 for the first time in its second motion, such that its notice of appeal is timely filed. AHISD adds that motions for summary judgment are limited to the grounds "expressly" asserted in them and the first motion did not assert a lack of subject matter jurisdiction.

The relevant timeline of events is as follows:

- December 10, 2020—suit is filed.

- March 16, 2021—AHISD files its first-filed motion captioned as a "Motion for Summary Judgment."

- June 25, 2021—trial court denies AHISD's motion, no appeal taken.

- July 13, 2022—AHISD files a second-filed motion captioned, "[AHISD's] Second Motion for Summary Judgment."

- March 8, 2023—AHISD's motion denied, notice of appeal filed 20 days later.

**A.  Controlling case law and the limited guidance it provides to the issue before us**

First, we note the law that *is* clear. A party may appeal from a district court's interlocutory order that grants or denies a plea to the jurisdiction by a governmental unit. Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8). Because it is an accelerated appeal, the party must file its notice of appeal within 20 days after the judgment or order is signed. Tex. R. App. P. 26.1(b); 28.1(a). A party who misses that deadline cannot reset the timetable by moving to reconsider and noticing its appeal from the date of denial of the motion to reconsider. *City of Houston v. Estate of Jones*, 321

S.W.3d 668, 670 (Tex. App.—Houston [14th Dist.] 2010), *aff'd in part, rev'd in part*, 388 S.W.3d 663 (Tex. 2012); *Dayco Products, Inc. v. Ebrahim*, 10 S.W.3d 80, 83 (Tex. App.—Tyler 1999, no pet.).

But only a few cases have tackled whether a governmental entity loses its right to an interlocutory appeal by filing successive motions, where the adverse ruling from the first motion was not appealed. While instructive, none squarely address the question before us.

In *City of Houston v. Estate of Jones*, the governmental entity filed successive pleas that each sought dismissal for want of jurisdiction. 388 S.W.3d 663 (Tex. 2012) (per curiam). The first plea was denied and not appealed. *Id*. at 664. The second plea was denied and was appealed. *Id*. Agreeing that the appeal was untimely, the Court there held that when the second motion only offers new reasons for immunity, the change is one of form over substance and is in effect a motion to reconsider. *Id*. at 667. The Court reasoned that if a governmental entity could file successive pleas to the jurisdiction by simply adding new reasons, it "would invite successive appeals and undermine the statute's purpose of promoting judicial economy." *Id.* at 667, (quoting *Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 358 (Tex. 2001)).

In *City of Magnolia 4A Econ. Dev. Corp. v. Smedley*, the Court again considered two motions, each of which sought dismissal for want of jurisdiction. 533 S.W.3d 297, 300 (Tex. 2017). The first was a plea to the jurisdiction presented through a Rule 91a motion that claimed even if the plaintiff's pleaded facts were true, they did not establish a waiver of governmental immunity. *Id*. at 298–99. The second motion was a traditional motion for summary judgment that sought to put forward facts that disproved any ground for immunity. *Id.* at 301. The Court there held that the motions were "sufficiently different based on both their substance and procedural nature" such that the second "was not a mere motion for reconsideration." *Id*. at 302.

In both *Estate of Jones* and *Smedley*, each set of successive motions *expressly* sought dismissal based on subject matter jurisdiction. *Smedley*, 533 S.W.3d at 298–99; *Estate of Jones*, 388 S.W.3d at 664. Here, however, AHISD's first-filed motion never mentioned subject matter jurisdiction.[4] Thus, the Residents' argument hinges on whether the denial of the first motion denied an *implied* plea to the jurisdiction, that then created an obligation on AHISD to appeal. We find limited guidance on that point as well. In *Thomas v. Long*, a governmental entity filed a combined motion for summary judgment and challenge to jurisdiction. 207 S.W.3d 334, 339–40 (Tex. 2006). The trial court did not rule on the plea to the jurisdiction but granted a partial judgment on the merits. *Id.* at 339. The governmental entity took an interlocutory appeal that the court of appeals dismissed because there was no express ruling on the plea to the jurisdiction. The supreme court, however, reversed because it found an implied ruling on the plea: "Because a trial court cannot reach the merits of a case without subject matter jurisdiction, a trial court that rules on the merits of an issue without explicitly rejecting an asserted jurisdictional attack has implicitly denied the jurisdictional challenge." at 339–40 (internal citation omitted). But clear from the opinion is that the summary judgment motion "asserted [a] jurisdictional attack" that "clearly challenged" subject matter jurisdiction. *Id*. at 339. That is, *Thomas* involves an implied *ruling* on plea, and not a motion that is an *implied plea*.

## B.   AHISD did not lose its right to appeal

These cases frame our dispute which asks whether the denial of a motion for summary judgment (that never mentions subject matter jurisdiction or governmental immunity) and that

---

[4] In its first-filed motion, AHISD cited no case law or authority establishing the trial court lacked subject matter jurisdiction. The word "jurisdiction" was only included in passing in two instances: (1) in listing the subtitles of Chapter 21; and (2) in generally discussing the jurisdiction of the justice court to grant injunctive relief when Chapter 21 applied to a transaction. Moreover, the motion never used the words "immune," "immunity," "waive," or "waiver." The Residents' response to the first motion likewise did not reference "jurisdiction" nor use any of these related terms. *See* Tex. R. Civ. P. 166a(c).

seeks only a dismissal with prejudice, is an implied ruling on an implied plea to the jurisdiction that must be immediately appealed. For four reasons, we conclude that it is not.

First, the substance of the two motions was different in the relief sought. A jurisdictional plea is "a 'dilatory plea' that challenges a court's jurisdiction to hear the case." *Abbott v. Mexican Am. Legis. Caucus, Texas House of Representatives*, 647 S.W.3d 681, 689 (Tex. 2022). Its purpose is to defeat a plaintiff's claims, "without regard to whether the claims asserted have merit." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). When granted, the court dismisses the case without reference to the merits. In comparison, the purpose of a summary judgment is "to eliminate patently unmeritorious claims and untenable defenses." *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 783 n.56 (Tex. 2017) (citing *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 n.5 (Tex. 1979)); *see also* Tex. R. Civ. P. 166a(c). A summary judgment resolves the merits. *See Hyundai Motor Co. v. Alvarado*, 892 S.W.2d 853, 855 (Tex. 1995). Here, the first motion for summary judgment asked the trial court to dismiss all the claims with prejudice. The portion of the second motion that asserted a jurisdictional challenge asks that the suit be dismissed for lack of jurisdiction. *Cf. Texas Comm'n on Env't Quality v. Union Pac. R.R. Co.*, No. 03-21-00082-CV, 2022 WL 1038198, at *4 (Tex. App.—Austin Apr. 7, 2022, pet. denied) (mem. op.) (determining governmental entity's motion for partial summary judgment was not a plea to the jurisdiction when the motion did not attempt to defeat any cause of action without regard to the merits, or contend the district court lacked jurisdiction, or challenge the district court's authority to decide the subject matter of a claim).

Second, while the initial premises in the two motions may be the same, the portion of the argument that legally justifies the trial court's action is different. Both motions begin with the premise that Chapter 21 does not govern the Residents' claim, but they diverge on how that

10

premise translates into the relief sought. On the merits, the inapplicability of Chapter 21 cuts the legs out of any duty owed by AHISD, because the duty to act must arise from somewhere. But the inapplicability of Chapter 21 has a different path to relief in the jurisdictional sense. The second motion includes two and half pages of case citations and arguments on the Resident's burden to overcome governmental immunity. It argues that the only ground available to overcome immunity for the Residents is through § 21.003, but that would in turn necessitate the existence of a claim under Chapter 21.

Third, no existing case authority squarely holds that a governmental entity raises a plea to the jurisdiction simply by asserting a predicate assertion that *could* be used to support such a plea. That is, there is case law that tells us when there is an implied ruling on a plea to the jurisdiction, but not when there is a ruling on an *implied* plea to the jurisdiction. Some existing cases hit around that proposition, and snippets from those cases can be cobbled together to suggest that *could* be the law. But we are unpersuaded absent controlling authority that it *should* be the law. And if it were the case, we would undermine several important policies.

Recognizing an implied ruling on an implied plea would undermine the legislative preference that governmental entities be allowed to test a trial courts' denial of a "plea to the jurisdiction" by interlocutory appeal. As here, an implied plea creates a snare for the unwary, inadvertently costing an entity its right to appeal. *See Mitschke v. Borromeo*, 645 S.W.3d 251, 261 (Tex. 2022) (noting historical development of rules designed to move Texas away from "traps" in its appellate procedure). That is, governmental entities could potentially sacrifice the right to appeal simply by making a merits-based argument in one of the several motions that can house a

11

jurisdictional plea, but which a court later determines could have been used to seek dismissal on governmental immunity grounds.[5]

Next, recognizing an implied plea to the jurisdiction would undermine Rule 33.1's directive that complaints should be made to the trial court through a motion that states "the grounds for the ruling . . .with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context[.]" Tex. R. App. P. 33.1(a)(1)(A). A party (or court) should not have to guess about whether a plea to the jurisdiction is before it (and therefore subject to interlocutory appeal). So rather than requiring government entities to expressly inform the trial court (and opposing counsel) that a jurisdictional dismissal motion is at issue, an implied-plea-rule would allow those entities to knowingly or unknowingly hide the ball.[6] Trial courts would fall into the role of "Inspector Javert, hunting for defects [in jurisdiction] that the parties do not see or raise." *See Rattray v. City of Brownsville*, 662 S.W.3d 860, 869 (Tex. 2023) ("[c]ourts are empowered to note potential jurisdictional defects sua sponte, but the adversary process remains the touchstone of litigation even in this context."). And for that matter, it would deny those who sue a governmental entity fair notice that some merits-based motion is also a stealth plea to the jurisdiction, a ruling on which can be immediately appealed.[7]

---

[5] A "plea to the jurisdiction" is not restricted to a "particular procedural vehicle[.]" *Texas Dep't of Crim. Justice v. Simons*, 140 S.W.3d 338, 349 (Tex. 2004). So, a jurisdictional plea *could* be through a variety of different singular or hybrid motions. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000) (stating plea may be raised through "other procedural vehicles, such as a motion for summary judgment."): *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 551 (Tex. 2019) (allowing pleas to be raised in no evidence motion for summary judgment); *City of Magnolia 4A Econ. Dev. Corp. v. Smedley*, 533 S.W.3d 297, 299–300 (Tex. 2017) (jurisdictional challenge raised through Rule 91a motion, and hybrid plea to the jurisdiction and motion for summary judgment).

[6] Add appellate court clerks to the list of interested parties; an attempted appeal of the first motion for summary judgment would have likely met with an appellate court clerk questioning the basis for the appellate court's ability to hear the denial of an interlocutory motion for summary judgment.

[7] It would also contravene the oft cited proposition that a party on appeal is restricted to the argument advanced to the trial court. *See Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W.3d 145, 159 (Tex. App.—Austin 2017, pet. denied) (collecting case for the proposition that "[t]o preserve error for appeal, the argument made in the trial court must comport with the argument made on appeal.). If the Residents were right, a governmental entity

12

Finally, dismissing the appeal here means that the parties must wait until a final trial on the merits to test whether governmental immunity precludes the claims. We are often reminded that court of appeals should seek to resolve cases on the merits, and not procedural failings. *See Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) (advising appellate courts to "reach the merits of an appeal whenever reasonably possible"); *Verburgt v. Dorner*, 959 S.W.2d 615, 616–17 (Tex. 1997) ("This Court has never wavered from the principle that appellate courts should not dismiss an appeal for a procedural defect whenever any arguable interpretation of the Rules of Appellate Procedure would preserve the appeal."); *Silk v. Terrill*, 898 S.W.2d 764, 766 (Tex. 1995) (in the context of supplementing the record, "[j]udicial economy is not served when a case, ripe for decision, is decided on a procedural technicality of this nature."). To be sure, that preference does not allow a court of appeals to create jurisdiction where none is established by statute. *Mitschke*, 645 S.W.3d at 261–62 (Tex. 2022). Yet here, the statute requires an interlocutory appeal of a "plea to the jurisdiction" and AHISD did not file a pleading denominated as a plea to the jurisdiction. This Court would be effectively renaming the pleading, and in doing so, avoiding the merits of this appeal. We decline to do so.

Fourth, we find no demonstrable prejudice to the Residents. True enough, some premises raised in AHISD's two motions were similar, if not repetitive. And were the filing of two motions done for some strategic purpose to give AHISD a leg up on the jurisdictional challenge, we might be more persuaded by the Residents' argument. But waiting two and half years to file its plea to the jurisdiction, and more than a year after losing its summary judgment, did AHISD no favors. It did not diminish the Residents ability to respond to the plea to the jurisdiction. It did not capitalize on any change in the law. It did not allow for successive appeals as feared in *Estate of Jones*, 388

could argue for a merits-based dismissal to the trial court, then on appeal pull out the plea to the jurisdiction argument with its own unique case law and standards.

13

S.W.3d at 667 ("the main purpose of the interlocutory appeal statute . . . is to increase [the] efficiency of the judicial process."); *see also Mitschke*, 645 S.W.3d at 263 ("Nothing suggests that the misfiling was done from trickery or to mislead anyone, and respondents have presented no argument about how Mitschke's filing the motion in the original docket number could have prejudiced them.").

We therefore deny Appellees' motion to dismiss and address the merits of the appeal.

## III. Did the Legislature Waive AHISD's Governmental Immunity?

As prefaced above, the governmental immunity question turns on whether the Legislature has waived immunity for the claims asserted. We frame that question with some historical background of the statutes relied on by the Residents.

### A. The statutory background

#### (1) Origins of Tex. Prop. Code Ann. § 21.046

In 1968, Congress passed the Federal-Aid Highway Act of 1968, Pub. L. No. 90-495, 82 Stat. 815 (codified at 23 U.S.C. §§ 501–512). Section 502 of that Act stated that the Secretary of Transportation "shall not approve any project" which would cause the displacement of any person, business, or farm *unless* the State Highway Department provided assurances for "fair and reasonable" relocation expenses and a "relocation assistance program" benefiting the displaced persons. *Id.* § 30, 82 Stat. at 831 (emphasis added).

A state as large as Texas cannot pass up federal highway dollars. So the Texas Legislature acted quickly and passed its own measure—limited to the State Highway Commission's acquisition of right of way—that allowed displaced persons to seek moving expenses, relocation payments, rental supplements. Act of March 24, 1969, 61st Leg., R.S., ch. 45, §1, 1969 Tex. Gen. Laws 133 (originally Tex. Rev. Civ. Stat. Ann. art. 667n-4, repealed 1983 and recodified at

14

Tex. Prop. Code Ann. § 21.046). In 1970, Congress passed the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Pub. L. No. 91-646, 84 Stat. 1894 (codified at 42 U.S.C.A. §§ 4601–4655). That measure expanded the Federal-Aid Highway Act beyond road construction to other federally funded projects. 42 USCA §§ 4601–4655.[8] In 1971, the Texas Legislature then broadened Article 6674n-4, making it applicable to the acquisition of real property by any "department, agency, . . . instrumentality . . . or . . . political subdivision" of the State; it was also relocated from Title 116 (State Highways) to Title 52 (Eminent Domain). Act of May 31, 1971, 62nd Leg., R.S., ch. 918, § 1, secs. 1–3, 1971 Tex. Gen. Laws 2817, 2817–18 (repealed 1983 and recodified at Tex. Prop. Code Ann. § 21.046). This expanded enactment also allowed for a person displaced to be paid moving expenses, relocation payments, and rental supplements. *Id.* Each instrumentality of the State was required to formulate rules and regulations to carry out the provision, but the payments were only authorized—they were not required. *Id*. But if paid, the amounts were limited to those authorized by the more comprehensive federal enactment. *Id.* § 1, sec. 2, 1971 Tex. Gen. Laws at 2818.

The 1971 revision was codified as Article 3266b in the old Texas Civil Statutes. Tex. Rev. Civ. Stat. Ann. art. 3266b (repealed 1983). Article 3266a, passed in the same legislative session, contains seven sub-sections that defined the jurisdiction of courts in eminent domain proceedings. Act of May 31, 1971, 62nd Leg., R.S., ch. 832, §§ 1–7, 1971 Tex. Gen. Laws 2536, 2536–37 (repealed 1983 and recodified at Tex. Prop. Code Ann. §§ 21.001–.003). And both Article 3266a and 3266b were nested in a cluster of twelve provisions that all govern eminent domain

---

[8] That federal act's stated purpose was to provide "fair and equitable treatment of persons displaced as a direct result of programs or projects undertaken by a Federal agency or with Federal financial assistance." 42 U.S.C.A. § 4621(b). The program is embodied in its 28 distinct subsections. One provision allows for recovery of "actual reasonable expenses" for a person displaced by the Federal Government's acquisition of property to relocate to a new property. *Id.* § 4622(a)(1). Another provision allows tenants so displaced to obtain rental assistance payments when they must relocate. *Id.* § 4624.

proceedings. *See* Tex. Rev. Civ. Stat. Ann. arts. 3264–3271 (repealed 1983) (all contained in Title 52 "Eminent Domain").

In 1973, the Legislature added a subsection that allowed those who were displaced by "code enforcement, rehabilitation, or demolition programs" to be considered "displaced" for the purposes of the section. Act of May 17, 1973, 63rd Leg., R.S., ch. 586, § 2, sec. 1A, 1973 Tex. Gen. Laws 1625, 1625–26 (repealed 1983 and recodified at Tex. Prop. Code Ann. § 21.046). Then in 1983, the Legislature adopted Chapter 21 as part of the newly enacted Texas Property Code. Act of May 26, 1983, 68th Leg, R.S., ch. 576, § 1, 1983 Tex. Gen. Laws 3475, 3497 (codified at Tex. Prop. Code Ann. §§ 21.001–.103). The move placed Article 3266b (now numbered as § 21.046) into the Chapter 21 titled "Eminent Domain." Tex. Prop. Code Ann. § 21.046.

And one last change. In 2011, the Legislature made the payments in § 21.046 mandatory, rather than discretionary, by replacing the word "may" provide, with "shall" provide. Act approved May 19, 2011, 82nd Leg., R.S., ch. 81, § 16, sec. 21.046, 2011 Tex. Gen. Laws 354, 360 (codified at Tex. Prop. Code Ann. § 21.046(a)).

### (2) Origins of Tex. Prop. Code Ann. § 21.043

In 1969, the Legislature amended Article 3265 to add a new section seven; it provided that a landowner who is "actually and physically displaced and permanently moves from his dwelling or place of business shall be entitled to, as a separate element of damages, the reasonable moving expenses" for personal property not to exceed $500 for personal property, or $5,000 for business property. Act of May 28, 1969, 61st Leg., R.S., ch. 772, § 1, sec. 7, 1969 Tex. Gen. Laws 2293 (repealed 1983 and recodified at Tex. Prop. Code Ann. § 21.043). Any move was limited to 50 miles, the cost could not exceed the market value of the personal property, and "this section shall not apply in any condemnation proceeding, whether before special commissioners or the court

where the owner is entitled to reimbursement for moving expenses under other existing law." *Id*. Article 3265 itself was titled "Rule of Damages" and contained five existing sections, each of which expressly addressed the damages that commissioners could award in condemnation awards. *See generally* Tex. Rev. Civ. Stat. Ann. art. 3265 (repealed 1983). The 1969 enactment also added a new § 6 that dealt with damages when a condemnation was dismissed. 1969 Tex. Gen. Laws § 1 at 2293.

In 1979, Article 3265, § 7 was revised to remove the $500 and $5,000 caps. Act of May 4, 1979, 66th Leg., R.S., ch. 206, § 1, secs. 6–7, 1979 Tex. Gen. Laws 449, 449–450 (repealed 1983 and recodified at Tex. Prop. Code Ann. § 21.043). And as part of codification of the Property Code, Article 3265, § 7, was included as § 21.043 in Chapter 21. Act of May 26, 1983, 68th Leg., R.S., ch. 576, § 1, sec. 21.043, 1983 Tex. Gen. Laws 3475, 3504–05 (codified at Tex. Prop. Code Ann. § 21.043). With minor textual revisions, it provides that "[a] property owner who is permanently physically displaced from the property owner's dwelling or place of business and who is not entitled to reimbursement for moving expenses under another law may recover, in addition to the property owner's other damages, the reasonable expenses of moving the property owner's personal property from the dwelling or place of business." Tex. Prop. Code Ann. § 21.043.

The question before us is whether § 21.043 or § 21.046 are provisions of general applicability whenever a political subdivision acquires property by any means that results in the displacement of persons. Or as AHISD urges, is it limited to times when the governmental entity exercises its right of condemnation. That right was not exercised here, and absent some statutory authority to sue, AHISD urges that the Residents have no basis to claim a waiver of governmental immunity.

17

**B. Standard of review and applicable law**

When it applies, governmental immunity protects political subdivisions of the State, including cities, from suit. *Texas Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999). Like sovereign immunity, and when it applies, governmental immunity protects political subdivisions of the State, including school districts, from suit. *See El Paso Educ. Initiative, Inc. v. Amex. Props., LLC*, 602 S.W.3d 521, 526 (Tex. 2020); *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). Immunity from suit implicates a trial court's subject matter jurisdiction. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). "Although the justifications for its existence have evolved through the years, we have steadfastly retained it in modern times precisely because it shields 'the public from the costs and consequences of improvident actions of their governments,' and ensures that the taxes the public pays are used 'for their intended purposes[.]'" *Hillman v. Nueces Cnty.*, 579 S.W.3d 354, 361 (Tex. 2019) (quoting *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006) and *Reata Const. Corp. v. City of Dallas*, 197 S.W.3d 371, 375 (Tex. 2006)). Immunity defeats "a cause of action without regard to whether the claims asserted have merit." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). But inherent in that principle is Justice Willett's observation that "just as immunity is inherent to sovereignty, unfairness is inherent to immunity." *City of Galveston v. State*, 217 S.W.3d 466, 480 n.38 (Tex. 2007) (Willett, J., dissenting).

Texas Courts have recognized that the Legislature "is best suited to make the policy-laden judgments as to if and how state government resources should be expended." *Bacon v. Texas Hist. Comm'n*, 411 S.W.3d 161, 172 (Tex. App.—Austin 2013, no pet.) (citing *Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011) and *Tooke*, 197 S.W.3d at 331–32)).

### C. Overview of the parties' contentions

AHISD offers several reasons why the trial court lacked jurisdiction over this claim. First, Chapter 21, where § 21.043 and § 21.046 are found, is a comprehensive statutory scheme to govern eminent domain proceedings, and the purchase of the Property was not accomplished through eminent domain. When a state entity chooses to exercise its condemnation powers, Chapter 21 imposes a specific process with safeguards for the property owner and the acquiring entity. The entity must undertake preliminary steps, such as informing the property owner of their rights and making a good faith offer. Tex. Prop. Code Ann. §§ 21.0111, 21.012, 21.0113. Failing an agreement at that stage, the entity initiates a condemnation proceeding, that allows a court to appoint special commissioners to determine a condemnation damage award. *Id.* §§ 21.012, 21.014–.015. That award is then reviewable through a second judicial stage. *Id.* § 21.018. Chapter 21 is itself divided into five subchapters that outline the procedures and protections available to property owners. And because § 21.043 and § 21.046 are embedded in the "Damages and Cost" section of Chapter 21, AHISD urges that they are part of that process, and not stand-alone provisions available outside of eminent domain.

Moreover, an actual waiver of immunity is found in § 21.003 that gives district courts the authority to "determine all issues, including the authority to condemn property and the assessment of damages" for suit in which a political subdivision is a party *and* "that involves a claim for property or for damages to property occupied by the party *under the party's eminent domain authority*[.]" *Id.* § 21.003 (emphasis added). As for § 21.043 and § 21.046, neither contain any express language waiving immunity, nor do they meet the exacting standard for finding a waiver. *See Hillman*, 579 S.W.3d at 360 (setting out five factors to determine whether a statute clearly and unambiguously waives governmental immunity); Tex. Gov't Code Ann. § 311.034 ("[A] statute

shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language."). Because that authority was never exercised here, AHISD contends this provision cannot waive its immunity.

The Residents argue a different view. They first direct us to the portions of the petition asserting *ultra vires* claims. Those claims seek to compel the named District officials to execute their non-discretionary statutory duties. Because *ultra vires* claims ask that an official execute their designated duties, they fall outside the governmental immunity bar. *See Fed. Sign v. Texas S. Univ.*, 951 S.W.2d 401, 404 (Tex. 1997) ("A state official's illegal or unauthorized actions are not acts of the State[]" and thus do not implicate the State's sovereign immunity). "To fall within this *ultra vires* exception, a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). From this body of law, the Residents argue that the District officials had non-discretionary duties under § 21.043 and § 21.046 to implement a program to provide relocations assistance.

Next, the Residents argue that under the plain statutory language of the statute, AHISD owed a duty to pay relocation expenses whenever it acquired property by any means. Section 21.046 uses the word "acquiring," and the common ordinary meaning of the root word encompasses more than just condemnation.[9] They also argue that some provisions in Chapter 21 expressly use the words "acquire through condemnation," so the omission of that phrase in § 21.046 must mean something. And the Residents bolster their construction with legislative

---

[9] For instance, Black's Law Dictionary defines "Acquire" as "To gain possession of control of; to get or obtain[.]" *Acquire*, BLACK'S LAW DICTIONARY (7th ed. 1999). Similarly, Webster's defines acquire as "to come into possession or ownership of; get as one's own; to acquire property[.]" *Acquire*, WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY (2003) (emphasis original).

history suggesting that § 21.043 and § 21.046 are meant to operate alongside the federal enactment, which applies outside the condemnation context.

Both AHISD and the Residents point us to case law and other authorities supporting their view, which we discuss in more depth below.

## D. Discussion

### (1) Framework for our analysis

Whether § 21.043 and § 21.046 encompass more than just condemnation is a question of statutory construction. We follow familiar guideposts in assessing statutes. Statutory construction presents a question of law that we review de novo. *Malouf v. State ex rels. Ellis*, No. 22-1046, 2024 WL 3075672, at *3 (Tex. June 21, 2024); *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the Legislature's intent. *Shumake*, 199 S.W.3d at 284. The plain meaning of the text is the best expression of legislative intent unless a different meaning is supplied by legislative definition or is apparent from the context, or unless the plain meaning would lead to absurd or nonsensical results that the Legislature could not have intended. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008); *see* Tex. Gov't Code Ann. § 311.011 ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage.").

We consider the words in context, and not in isolation. *In re Office of the Att'y. Gen. of Texas*, 456 S.W.3d 153, 155 (Tex. 2015) (per curiam) ("Given the enormous power of context to transform the meaning of language, courts should resist rulings anchored in hyper-technical readings of isolated words or phrases."). A court must also presume that the Legislature chose its language with care, and that it included (or omitted) each word purposefully. *Emeritus Corp. v. Blanco*, 355 S.W.3d 270, 276 (Tex. App.—El Paso 2011, pet. denied). Finally, a statute is

presumed to have been enacted by the Legislature with complete knowledge of the existing law and with reference to it. *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990).

### (2) The *ultra vires* claims funnel us back to the same question

The Residents concede in their briefing that they do not claim § 21.046 contains the necessary language to waive a governmental immunity. Instead, they focus on its mandatory language, and the consequent non-discretionary obligations for District officials to create programs, provide relocation assistance, or pay sums. The Residents contend violations of these duties can be pursued as *ultra vires* claims. Our high court has held that "that while governmental immunity generally bars suits for retrospective monetary relief, it does not preclude prospective injunctive remedies in official-capacity suits against government actors who violate statutory or constitutional provisions." *Heinrich*, 284 S.W.3d at 368–69. The rationale for *ultra vires* claims is that they "do not seek to alter government policy but rather to enforce existing policy." *Id.* at 372. And they may do so even if the result of enforcement implicates the public fisc. *Id.* at 371.

There are important limitations to *ultra vires* claims. First, they must be against appropriate officers acting in their official capacity, and *not* the state institution that they serve. *Heinrich*, 284 S.W.3d at 377 ("Thus, Heinrich's claims for prospective relief may be brought only against the appropriate officials in their official capacity, and her statutory claims for future benefits against the City, Fund, and Board must be dismissed."). For that reason alone, we are compelled to reverse the order below and dismiss the District for want of jurisdiction. That leaves the named school officials.

To fall within the *ultra vires*, exception, "a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id*. at 372. A "government

officer with some discretion to interpret and apply a law may nonetheless act 'without legal authority,' and thus *ultra vires*, if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016). Ministerial acts are those "where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 587 (Tex. 2015) (quoting *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994)).

The parties have not addressed (and neither do we) how the alleged failure to provide advisory services, relocation assistance, or to adopt rules relating to the administration of an assistance program fit the "without legal authority" or "ministerial act" requirement for *ultra vires* claims (the statute does not define the scope of those services or rules other than to say they should be compatible with federal policy). Nor do the parties directly address how *ultra vires* claims fit with a statute that requires payment of an indeterminate amount of moving expenses, rental supplements, and relocation payments (the statute sets a ceiling but not a floor for payments). But setting those questions aside, we are still returned to whether these statutes apply to the acquisition of this Property and create the mandatory duties as the Residents claim. If there is a statutory duty, it arises only if § 21.043 and § 21.046 apply to the acquisition of property through something other than a condemnation. And if they do not apply here, then there is no duty to underpin an *ultra vires* claim.

### (3) The context and placement of § 21.046 limits it to condemnation cases

Juxtaposing the parties' arguments, the Residents focus on the common meaning of "acquiring" while AHISD narrows the word's common meaning by its contextual use in

Chapter 21. We agree that here, context controls and that the word "acquiring" in § 21.046 cannot be read in isolation of the 43 other provisions that surround it.

The Texas Supreme Court often reminds us of the importance of context. Courts are required to construe words in light of their statutory context, considering the statute as a whole. *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019). As the Court recently stated:

> This Court also relies on statutory context when construing statutes. Our "text-based approach to statutory construction requires us to study the language of the specific provision at issue, within the context of the statute as a whole, endeavoring to give effect to every word, clause, and sentence." *Ritchie v. Rupe*, 443 S.W.3d 856, 867 (Tex. 2014). We determine the meaning of the words a statute uses by "considering the context in which they are used, not in isolation." *Silguero*, 579 S.W.3d at 59.

*Malouf*, 2024 WL 3075672, at *10. The United States Supreme Court echoes a similar admonition: "[I]t is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.'" *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Deal v. United States*, 508 U.S. 129, 132, (1993)). Stated otherwise, "[w]ords in a vacuum mean nothing. Only in the context of the remainder of the statute can the true meaning of a single provision be made clear." *McLane Champions, LLC v. Houston Baseball Partners, LLC*, 671 S.W.3d 907, 920 (Tex. 2023) (quoting *Bridgestone/Firestone, Inc. v. Glyn-Jones*, 878 S.W.2d 132, 133 (Tex. 1994)).

The most important contextual clue for the meaning of "acquiring" in § 21.046 is its placement within a series of sections that comprehensively deal with eminent domain. The first three sections in Chapter 21, grouped under Subchapter A (Jurisdiction), grant jurisdiction to courts in eminent domain cases. Tex. Prop. Code Ann. § 21.001–.003. The next 20 sections, grouped in Subchapter B (Procedure), define the procedures for how a governmental entity exercises its eminent domain authority. *See id.* §§ 21.011–.025. Those procedures include initial disclosures to a landowner (§ 21.0111), providing a bill of rights (§ 21.0112), making a bona fide

offer (§ 21.0113), filing of a condemnation petition (§ 21.012), the appointment and findings of special commissioners, (§§ 21.014, 21.018), and the appeal from the commissioner's decision (§ 21.018).

Section 21.043 and 21.046 are contained in Subchapter C (Damages and Costs). It contains ten sections, eight of which expressly relate to payments owed in property condemnation cases. *Id.* § 21.041 (evidence for assessing actual damages from a "condemnation"); § 21.042 (assessment of damages by "special commissioners" in a "condemnation"); § 21.044 (allowing damages from temporary possession against "condemnor" who had no right to "condemn" the property); § 21.045 (related to title acquired by "condemnor"); § 21.047 (assessment of cost and fees by special commissioners from "eminent domain proceedings"); § 21.048 (requiring special commissioners to issue a statement of damages and costs in an "eminent domain proceeding"); § 21.049 (requiring notice of decision of special commissioners to be filed).

The next five sections in Chapter 21, under Subchapter D (Judgment), address the judgment in a condemnation case, the writ of possession, and any appeal. *Id.* §§ 21.061–21.065. The final five sections outline the process of repurchase of property from a condemning entity. *Id.* §§ 21.101–.103 (Repurchase of Real Property From Condemning Authority).

We acknowledge the Government Code's admonition that "[t]he heading of a title, subtitle, chapter, subchapter, or section does not limit or expand the meaning of a statute. Tex. Gov't Code Ann. § 311.024. Yet those headings can inform of the Legislature's intent. *See TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 75 (Tex. 2016) ("The headings here confirm a rule/exception model, rather than the opposite."); *In re United Services Auto. Ass'n*, 307 S.W.3d 299, 307–08 (Tex. 2010) (noting that statutory provision titled "Statute of Limitations" gave some indication of the Legislature's intent); *Univ. of Texas Sw. Med. Ctr. at Dallas v. Loutzenhiser*, 140

S.W.3d 351, 361 (Tex. 2004) (stating that the heading used in a statute gave "some indication of the Legislature's intent to group what it considered to be procedural matters together.").

But even without the headings, we would still find 43 sequentially numbered sections that outline the procedures for initiating, conducting, and concluding condemnation proceedings. To assume that § 21.046 was just randomly placed in this sequence of statutes and is not tied to condemnation defies reason.

We also acknowledge the Residents' argument that the creation of the Property Code in 1983 was intended as a non-substantive change in the law. *See G.P. Show Productions, Inc. v. Arlington Sports Facilities Dev. Auth., Inc.*, 873 S.W.2d 120, 122 (Tex. App.—Fort Worth 1994, no writ). Yet the predecessor to § 21.043— Article 3266b—was also grouped in the Texas Revised Civil Statutes with the eminent domain articles.[10] That article was placed in Title 52, labeled Eminent Domain, containing Articles 3264 to 3271. It was placed next to Article 3266a which provides for court jurisdiction in condemnation cases.[11] And like the current Chapter 21, those articles contained the procedures and process for condemnation. Moreover, the only court to have considered Article 3266b believed it applied only in eminent domain proceedings.

In *City of Beaumont v. West*, a landowner claimed that the city intended to construct a street across property that she used in her business. 484 S.W.2d 789, 790 (Tex. App.—Beaumont 1972, writ ref'd n.r.e.). She claimed that (as here) the City refused to negotiate over sums she believed were due under Article 3266b. *Id.* The City admitted that it intended to institute eminent domain proceedings *if* the Plaintiff did not accept their offer. The City denied that Article 3266b applied.

---

[10] Act of May 31, 1971, 62nd Leg., R.S., ch. 918, § 1, secs. 1–3, 1971 Tex. Gen. Laws 2817 (repealed 1983 and recodified at Tex. Prop. Code Ann. § 21.046).

[11] Act of May 31, 1971, 62nd Leg., R.S. ch. 832, § 1, 1971 Tex. Gen. Laws 2536 (repealed 1983 and recodified at Tex. Prop. Code Ann. §§ 21.001–.003).

Before the City had formally initiated a condemnation action, the landowner filed a declaratory judgment action seeking a declaration that Article 3266b applied to the City's contemplated condemnation proceeding. *Id.* She sought, and obtained, an injunction restraining the City from starting condemnation proceedings until her declaratory judgment action was concluded. *Id.*

In an appeal from that injunction, the Beaumont court identified the "narrow question" before it as "whether or not the county court had any jurisdiction to hear and determine the questions presented at the time it entered the order enjoining the City from prosecuting its proposed condemnation proceeding." *Id.* at 792. The *West* court found that a trial court could "acquire jurisdiction of the condemnation proceedings only by the filing of the petition for condemnation and notice to the landowner served in accordance with [Article 3264]. *Id.* Because the City had not yet filed any eminent domain proceeding, the trial court lacked jurisdiction to hear and determine the landowner's claim, including whether she was entitled to benefits under Article 3266b. *See id.*

One take away from this case is that the court viewed Article 3266b (the predecessor to § 21.046) as being tied to the eminent domain procedures. And unsurprisingly so, because at the time, Article 3266b was nestled with the rest of Texas' eminent domain law. That would have been the legal background when the Property Code was enacted, which similarly places Article 3266b's successor alongside the balance of Texas condemnation provisions. That context provides another significant clue to the Legislature's intent of what "acquiring" means in § 21.046. "We presume the Legislature enacted the statute 'with complete knowledge of the existing law and with reference to it.'" *In re Bridgestone Am.'s Tire Operations, LLC*, 459 S.W.3d 565, 572 (Tex. 2015) (quoting *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990)).

The Residents discount *West*, because at the time, Article 3266b only allowed entities the discretion to provide assistance. It did not require it. And true enough, almost two decades later, the Legislature made the payments in § 21.046 mandatory, rather than discretionary, by replacing the word "may" provide, with "shall" provide. Act approved May 19, 2011, 82nd Leg., R.S., ch. 81, § 16, 2011 Tex. Gen. Laws 360 (codified at Tex. Prop. Code Ann. § 21.046(a)). But we fail to see how that change nullifies the view then that relocation payments were tied to condemnation proceedings. If anything, making the payments mandatory would place a greater financial burden on governmental entities, and if the Legislature intended to take that more drastic step for *all* property acquisitions, it could have made that intent clear by removing § 21.046 from the Eminent Domain Title in the Property Code.

AHISD also responds to this argument, noting that the enabling clause for the 2011 changes in Chapter 21 states the change in the law applies "only to a *condemnation proceeding* in which the petition is filed on or after the effective date of this Act and to any property condemned through the proceeding." 2011 Tex. Gen. Laws § 24 at 363 (emphasis supplied). These changes were all part of S.B. 18. The caption of that bill reads "An act relating to the use of eminent domain authority." *Id*. The Government Code allows that "[i]n construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the . . . title (caption)[.]" Tex. Gov't Code Ann. § 311.023.[12, 13]

---

[12] Explanatory bill captions are constitutionally required in Texas: "The rules of procedure of each house shall require that the subject of each bill be expressed in its title in a manner that gives the legislature and the public reasonable notice of that subject." Tex. Const. art. III, § 35.

[13] The Author's/Sponsor's Statement of Intent for S.B. 18 would also show it was focused on condemnation:

> Currently, the Fifth Amendment to the United States Constitution prohibits the taking of private property for public use without just compensation, commonly referred to as the "takings clause." Section 17 of Article I of the Texas Constitution, prohibits a person's property from being taken, damaged, or destroyed for public use without adequate compensation, unless by consent of that person.

In sum we are persuaded that the context of § 21.046 limits its application to condemnation proceedings. Here, context controls over the ordinary meaning of one word viewed in isolation. *See City of Houston v. Bates*, 406 S.W.3d 539, 544 (Tex. 2013) ("Whereas we are typically inclined to apply a term's common meaning, a contrary intention is apparent from the statute's context."); *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning.").

We find the Resident's other arguments to the contrary unavailing. They point us to § 21.011 which reads: "Exercise of the eminent domain authority in all cases is governed by Sections 21.012 through 21.016 of this code." Tex. Prop. Code Ann. § 21.011. From this, the Residents reason that because § 21.046 is not within that range of section numbers, it is not part of eminent domain. But that section defines the "exercise" of eminent domain "authority" and the provisions listed set out the process from the condemnation petition (§ 21.012) to the hearing by the special commissioners (§ 21.015). It simply means all condemnation flows through that process, not that other provisions are independent of condemnation. For there are a host of provisions outside that range that can only apply to condemnation proceedings. *E.g.*, § 21.042

S.B. 18 makes changes, additions, and deletions, to various provisions in Texas law in an attempt to reform the power, limitations, process, and various other aspects of the power of eminent domain and condemnation in this State.

As proposed, S.B. 18 amends current law relating to the use of eminent domain authority.

Senate Rsch. Ctr., Bill Analysis, Tex. S.B. 18, 82nd Leg., R.S. (2011). The Fiscal Note to the bill noted that it would have a significant fiscal impact on local governmental entities, but again, it analyzed the bill as amendments to the framework of condemnation proceedings. *See* Fiscal Note, S.B. 18, 82nd Leg., R.S. (2011) ("The bill would amend various statutes related to the scope and process of private property condemnation under the power of eminent domain.").

(defining how special commissioners assess damages); § 21.061 (relating to judgment on special commissioner's finding); § 21.063 (authorizing appeal of condemnation award).

The Residents also direct us to provisions in Chapter 21 they say apply to the voluntary purchase of property. From this, they reason that Chapter 21 is not exclusive to condemnation proceedings. But that says too much. The provisions the Residents rely on relate to preliminary steps that a governmental entity with eminent domain authority must take before filing the condemnation petition—such as making a good faith offer and informing the prospective seller of their rights. *Id.* § 21.0112–.0113. These predicate steps must occur as an important part of the condemnation process.[14] And while true that the landowner might accept the governmental entity's good faith offer—and a condemnation suit might never be filed—that does not mean that condemnation was never a part of the process. A landowner negotiating with a governmental entity is surely on a different footing from those in a typical arm's length negotiations. A landowner who rejects the government's offer cannot always just walk away from the table.

Next, the Residents point to some provisions in Chapter 21 that use the phrase "acquired through eminent domain" while § 21.046 simply uses "acquiring real property." *Compare* § 21.046(b) *with* §§ 21.101(a); 21.102; 21.1021(a). Because the Legislature added that prepositional phrase in some places in Chapter 21, the Residents reason that its omission in § 21.046 carries significance. *See Malouf*, 2024 WL 3075672, at *11 ("[W]e generally presume the Legislature uses the same word consistently throughout a statute and uses different words to

---

[14] A case that that Resident's cite makes that point. *Texas Cent. R.R. & Infrastructure, Inc. v. Miles*, 635 S.W.3d 684 (Tex. App.—Corpus Christi 2020), *aff'd*, 647 S.W.3d 613 (Tex. 2022). The central issue in that case was whether certain entities who were surveying the route for a high-speed train between Dallas and Houston have eminent domain authority—the court of appeals concluded that they did. *Id.* at 688, 692. The court also concluded that one of the entities violated § 21.0112 by failing to provide a landowner with the landowner's bill of rights when it first approached him about surveying his property. *Id.* at 695. That section requires that "an entity with eminent domain authority shall provide a copy of the landowner's bill of rights statement to a landowner before or at the same time as the entity first represents in any manner to the landowner that the entity possesses eminent domain authority." Tex. Prop. Code Ann. § 21.0112.

convey different meanings."). Most of the references that the Residents rely on are found in Subchapter E, which defines when and how a property owner can repurchase real property from a condemning entity. That right might arise if the public project is cancelled, no progress is made on the project in ten years, or the property becomes unnecessary for the project. Tex. Prop. Code Ann § 21.101(a)(1)–(3).

The repurchase provisions were added to Chapter 21 as a new Subchapter E in 2003. Act approved June 21, 2003, 78th Leg., R.S., ch. 1307, § 2, 2003 Tex. Gen. Laws 4739 (codified at Tex. Prop. Code Ann. §§ 21.101–.103); *State v. LBJ/Brookhaven Invs. , L.P.*, 650 S.W.3d 922, 926–27 (Tex. App.—Dallas 2022, pet. denied) (setting out the history of the provisions). We find nothing in the text of the new provisions that suggests the Legislature intended to redefine how the word "acquiring" had been used in Article 3266b, and later § 21.046, for the several decades those provisions had been on the books. It would be no surprise that in adding this new subchapter, the Legislature would want to be clear that it only applied to property acquired through eminent domain, and not by other means. Moreover, § 3 of the 2003 enactment provides another important clue to how the Legislature uses the word acquire. Section 3(a) provides: "Subchapter E, Chapter 21, Property Code, as added by this Act, applies only to a real property interest *acquired* by a governmental entity on or after the effective date of the Act." 2003 Tex. Gen. Laws § 3 at 4740 (emphasis added). Then § 3(b) immediately follows: "A real property interest that was *acquired* by a governmental entity before the effective date of this Act *through eminent domain* for a public use is governed by the law as it existed immediately before the effective date of this Act[.]" *Id.* (emphasis added). The use of the singular term "acquired" soon followed by the more definitive statement of "acquired . . . through eminent domain" is a strong indicator that the Legislature uses these terms interchangeably in Chapter 21 and does use them to mean different

31

things. *Cf. In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024) ("When the Legislature uses *substantially the same words and phrases in a statute*, subsequent uses of that same word in the same subject area ordinarily carry the same meaning.") (emphasis added).[15, 16]

Next, the Residents point us to added § 21.046(e) which addresses "code enforcement, rehabilitation, and demolition program." Tex. Prop. Code Ann. §21.046(e). Because none of those situations necessarily encompass condemnation, the Residents reason that the other subsections of § 21.046 apply outside the condemnation process. This subsection was added in 1973. Act of May 17, 1973, 63rd Leg., R.S., ch. 586, § 2, 1973 Tex. Gen. Laws 1625, 1625–26 (repealed 1983 and recodified at Tex. Prop. Code Ann. § 21.046). The Bill Analysis acknowledged that "Under present law relocation expenses may be paid only where condemnation proceedings have been initiated." Bill Analysis, Tex. H.B. 606, 63rd Leg., R.S. (1973). The amendment brought Texas into conformity with federal relocation assistance requirements. *Id*. Each of the § 21.046(e) situations involve a common thread—a government's coercive power to regulate the use of private property. They serve as a stand in for condemnation, and are a logical addition to § 21.046. Thus they do not inform our view of AHISD's duties in acquiring this Property.

---

[15] For the same reason, how the term "acquire" is used in Tex. Prop. Code Ann. § 21.0111(c) does not inform our view of § 21.046. That section requires an "entity seeking to acquire property . . . through the use of eminent domain" to timely disclose appraisal reports on the property. Yet § 21.0111(a), dealing with the same disclosure requirements, refers to entities "with eminent domain authority that wants to acquire real property for a public use[.]" And § 21.0111(b) more simply refers to an "entity seeking to acquire the property[.]" The several ways that the Legislature uses acquire shows that they all share the same meaning: acquiring property through eminent domain. *See State v. LBJ/Brookhaven Invs., L.P.*, 650 S.W.3d 922, 928 (Tex. App.—Dallas 2022, pet. denied) ("Chapter 21, and the repurchase statute itself, is limited to property acquired through eminent domain; thus, for the repurchase statute to apply at all, the property must have been acquired by eminent domain.").

[16] The contextual canon that the Residents implicitly rely on is the "presumption of consistent use." Antonin Scalia & Bryan A. Garner, Reading Law 170–71 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation meaning."). But this canon "assumes a perfection of drafting that, as an empirical matter, is not often achieved." *Id*. Drafters "often (out of a misplaced pursuit of stylistic elegance) use different words to denote the same concept." *Id*.

The Residents then urge a backstop—that they were displaced as a direct result of a demolition program. That is, AHISD demolition of the apartment complex qualifies as a "demolition program" under § 21.046(e). This theory was raised in a reply brief below but suffers from the lack of any evidence that AHISD's demolition of the apartment complex was part of a "demolition program." That term is not defined in the statute. The word "program" has a variety of meanings (i.e., a TV program or computer program). But relevant here, the dictionary meaning includes: "a plan of action to accomplish a specified end; *a school lunch program*" or "a planned coordinated group of activities, procedures, etc., often for a specific purpose, or a facility offering such a series of activities: *a drug rehabilitation program; a graduate program in linguistics*." *Program*, WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY (2003) (emphasis original).

In common parlance, we might speak of a football program, and understand it consists of facilities, coaches, and equipment to play an entire series of games, over more than a single season. In governmental parlance, we might speak of notable federal programs—Medicare, Social Security, School Lunch, or Disability Insurance programs. Each have served multiple participants over many decades. Texas governmental programs include systems like "crime prevention programs" that a crime control and prevention district might establish. Tex. Loc. Gov't Code Ann. § 363.151. Or the "drug offense program" that serves multiple offenders across the judicial system. *See* Tex. Gov't Code Ann. § 171.0001. Or prison rehabilitation programs available to an entire prison population. *See* Tex. Gov't Code Ann. § 507.033. In sharp contrast, the tear down of a single apartment complex on a single piece of property is a *project*. And significantly, the Texas Legislature used the word "program" and not the dual terms "program or project" that is used throughout the federal Uniform Relocation Assistance and Real Property Acquisition Policies for Federal and Federally Assisted Programs. 42 U.S.C.A. § 4601(6)(A)(i)(I), (ii)(I), (B)(ii); (11)

33

(definitional sub-sections all referring to "programs or projects"); *Id.* § 4633(a)(4) (requiring agency to "ensure that relocation assistance activities under this chapter are coordinated with low-income housing assistance *programs or projects* by a Federal agency or a State or State agency with Federal financial assistance[.]") (emphasis added); *Id.* § 4622(a) ("Whenever a *program or project* to be undertaken by a displacing agency will result in the displacement of any person, . . .") (emphasis added).

We do not discount that a school district might embark on what could be proven to be a demolition program, if for instance it included attributes of commonly understood governmental programs. This record, however, lacks any evidence to show the demolition of a single apartment structure on a single piece of land next to a single school was anything more than a project.

Finally, the Residents also fall back on legislative history, emphasizing that the predecessor to § 21.046 was enacted alongside federal legislation that is not limited to acquiring property by condemnation. An earlier Attorney General's opinion explains the connection of Article 3266(b)—originally numbered as Article 6674n-4—to the federal statute:

> It is clear from the structure of article 6674n-4, its repeated reference to the Federal Highway Relocation Assistance Program and the time of its enactment, that it was passed as enabling legislation to permit the State Highway Department to comply with the requirements of the Federal highway Relocation Assistance Act in acquiring rights of way for its federally-funded projects.

Tex. Att'y Gen. Op. No. JM-8 (1983).[17] The Texas Legislature similarly broadened Article 3266b to cover more than just highways to follow a federal expansion of relocation rights. *Id*. ("This expansion was required for the same reason that the passage of the original article 6674n-4 was required, that is, in order to enable the affected agencies to comply with the mandatory

---

[17] The Residents read the Attorney General Opinion to support its view that § 21.046 applies outside of condemnation cases. We disagree—it informed the requesting party, Texas Southern University, that Article 3266b applies to it, but that the school was not required to comply with Article 3266b unless it was required to by federal law. *Id.*

requirements of federal relocation assistance legislation."). The assistance payments were permissive because not all projects involved the receipt of federal funds. *Id*. But we fail to see how this helps the Residents, as that original intent was to create a needed counterpart when federal funds were used to acquire property. If that was the intent, it has no relevance here, as there is no showing that this purchase was part of some federal program or project. And as we explain below, § 21.046 only became mandatory through S.B. 18. And the legislative history of that bill shows it was altering Texas eminent domain law.

In summary, we might agree that the Legislature adopted the predecessor to § 21.046 to dovetail with federal relocation requirements, allowing Texas to participate in federal funding. The relocation services and payments were discretionary, allowing a governmental entity to comply when it needed to under federal law, or when it desired to for its own reasons. The terms of § 21.046 only became mandatory in 2011, and nothing informs us that at that time the Legislature intended to adopt the comprehensive obligations that the federal government imposes on itself. Instead, the mandatory obligations in Texas fall within the much narrower scope of eminent domain.

### (4)   Section 21.043

The Residents urge an alternative ground that § 21.043 itself waives governmental immunity and supports a portion of their claim (it applies only to moving expenses). Yet the context for § 21.043 also shows that it is also limited to condemnation proceedings. It was adopted as a new section under Article 3265, whose other sections specifically addressed the damages that special commissioners could award in condemnation awards. Act of May 28, 1969, 61st Leg., R.S., ch. 772, § 1, secs. 6–7, 1969 Gen. Law Tex. 2293 (repealed 1983 and recodified at Tex. Prop. Code Ann. § 21.043). It now appears alongside eight other sections in Chapter 21 that expressly

apply to eminent domain proceedings. Section 21.043 itself provides: "[a] property owner who is permanently physically displaced from the property owner's dwelling or place of business and who is not entitled to reimbursement for moving expenses under another law may recover, in addition to the property owner's other damages, the reasonable expenses of moving the property owner's personal property from the dwelling or place of business." Tex. Prop. Code Ann. § 21.043(a).

In support of their claim that § 21.043 itself waives governmental immunity, the Residents rely on *State v. Langley*, 232 S.W.3d 363, 368 (Tex. App.—Tyler 2007, no pet.). That case ultimately held that the property owners were barred by sovereign immunity for seeking moving expenses under § 21.043, because they had not made a claim under § 21.046 before the special commissioners during the administrative phase of the condemnation case. *Id*. at 368. In its discussion, the court makes the statement that "[w]here applicable, section 21.043(a) is a sufficiently clear waiver of sovereign immunity." *Id*. at 368. But "where applicable" meant when it is part of a condemnation suit. And for that kind of suit, immunity is expressly waived in Tex. Prop. Code Ann. § 21.003. This suit is not a Chapter 21 condemnation proceeding, and we question whether § 21.043 by itself accomplishes a waiver of governmental immunity.[18]

### (5) Because this property was not acquired by condemnation, neither § 21.043 nor § 21.046 apply

The summary judgment record conclusively establishes that the District did not use its eminent domain authority to purchase the apartment complex where the Residents previously lived. Because the Residents claims all turn on statutory provisions that apply only to eminent

---

[18] *Langley* predates *Hillman v. Nueces Cnty.*, 579 S.W.3d 354, 361 (Tex. 2019) which sets out five factors to consider whether a statute clearly and unambiguously waives immunity. *Langley* cites no authority other than the statute itself for its statement on waiver of immunity. *Langley*, 232 S.W.3d at 368. Section 21.043 itself makes no mention of immunity, or contains any explicit waiver of immunity as found in other statutes. *Cf.* Tex. Gov't Code Ann. § 554.0035 ("Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter.").

domain, they cannot establish the ministerial duties or violations of law necessary for their *ultra vires* claims.

\* \* \* \* \* \* \* \*

When a willing buyer and willing seller arrive at a sales price, it is fair to assume that the seller has considered the consequential costs—like moving or finding a new property if that is needed. Yet when the sale is forced—as through a government's eminent domain power—the seller (and by extension, any tenant) is in a different posture. They lack the ability to just say no to the sale. Understandably, the Legislature included protections for Texas landowners (or tenants) faced with a forced sale to a governmental entity. Looking at Chapter 21 as a whole, and § 21.043 and § 21.046 in context, we are persuaded those provisions stand as safeguards in condemnation proceedings. We are unpersuaded that the Legislature also meant those provisions to govern arm's length bargained for exchanges.

## IV. CONCLUSION

We deny the Residents' motion to dismiss. We sustain Appellants' First Issue and reverse the order of the trial court denying Appellants' plea to the jurisdiction and dismiss Appellees' claims against the Appellants for lack of jurisdiction.


JEFF ALLEY, Chief Justice

August 28, 2024

Before Alley, C.J., Palafox and Soto, JJ.